UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-20044-CR-LENARD

**UNITED STATES OF AMERICA**,

        Plaintiff,

vs.

**JUAN RENE CARO, MAYTEMAR
CORPORATION d/b/a La Bamba
Check Cashing, et al.**,

        Defendants.
_____/

**<u>OMNIBUS ORDER DENYING DEFENDANTS JUAN RENE CARO AND
MAYTEMAR CORPORATION'S CORRECTED MOTION FOR NEW TRIAL
(D.E. 602) AND AMENDED MOTION TO COMPEL DISCOVERY IN SUPPORT
OF MOTION FOR NEW TRIAL (D.E. 618)</u>**

**THIS CAUSE** is before the Court on the Defendants Juan Rene Caro and Maytemar Corporation d/b/a La Bamba Check Cashing's Corrected Motion for New Trial (D.E. 602), filed on January 4, 2011 and Amended Motion to Compel Discovery and Evidentiary Hearing In Support of Their Motion For New Trial (D.E. 618), filed on July 12, 2011.  The Government filed Responses in Opposition to both motions (D.E. 609, 620) on February 22 and July 30, 2011, respectively, to which Defendants replied (D.E. 613, 625) on April 4 and September 1, 2011, respectively.  Upon review of the Motions, Responses, Replies and the record, the Court finds as follows.

**I.**      **Factual and Procedural Background**

Defendants Juan Rene Caro and Maytemar Corporation d/b/a La Bamba Check Cashing were indicted on January 17, 2008 on charges of filing false currency transaction

reports (CTRs) and conspiracy to do same.  (*See* Indictment, D.E. 4.)[1]  Jury trial commenced on November 5, 2008 (D.E. 245) and ended on February 10, 2009 (D.E. 393).  Caro was found guilty of conspiracy to file false CTRs (Count 1) and eleven counts of filing false CTRs (Counts 6-16); La Bamba was found guilty of conspiracy to file false CTRs (Count 1) and fourteen counts of filing false CTRs (Counts 18-19, 22-33).  (*See* Caro Verdict Form, D.E. 383; La Bamba Verdict Form, D.E. 384.)

      **A.**     **Evidence at Trial and Nevin Shapiro's Testimony**

The evidence at trial against Caro and La Bamba centered around proving that Defendants filed false CTRs reflecting financial transactions with numerous purported construction companies that were actually shell companies.  The case against Defendants included: nominee owners of the shell companies who testified to their dealings with Caro (Tomas Garcia, Eduardo Olivar, Marvin Marroquin), contractors who testified they received the names of the shell companies from Caro (Rodrigo Donadillo, Adhelino Augustino, Mario Varela) and video footage of Caro engaged in illegal activities such as structuring deposits to avoid bank detection, acknowledging the companies that were cashing checks were fictitious, distributing business cards of the fictitious companies and making comments suggesting that he was seeking to evade law enforcement.

The Government also presented the testimony of Nevin Shapiro, an acquaintance of Caro's, on December 11, 2008.  Shapiro testified that he was a wholesale grocery broker and raised capital for real estate projects. (Shapiro Trial Testimony Tr. at 4:16-18,

---

[1]    A Superseding Indictment (D.E. 140) was filed on June 28, 2008.

D.E. 609-1.)  He met Caro while attending Miami Heat basketball games and engaged in about seven financial transactions with Caro in order to pay off illegal gambling debts. (*See, e.g.*, Tr. at 13:11-14:4.)  Shapiro would receive cash from Caro and repay him sometime later with checks written out to various companies at Caro's direction.  *(See, e.g.*, Tr. at 18:25-19:2.)  He made the seven checks out to Huber Construction, D&C Construction, AFP Painting (twice), AFC Painting and La Bamba (twice).  (Tr. at 10:14-18; 14:5-11; 16:10-16; 18:1-5; 21:6-19.)  Shapiro culminated his direct examination by stating that he had not received any promises from the government as to whether he would not be charged with gambling, tax or bank fraud.  (Tr. at 25:3-17.)

On cross-examination, Shapiro revealed that he had an interest in keeping his gambling losses from Caro.  (Tr. at 38:12-16.)  Shapiro was questioned, over the Government's objection, about Capital Investments and admitted he had an interest in the company, but that it was not an investment fund.  (Tr. at 48:17-49:3.)  He also divulged his ownership interest in Ocean Rock Enterprises and Axcess Sports and Entertainment. (Tr. at 49:5-50:6.)

Defense counsel got Shapiro to admit that Caro had basis to believe Shapiro was involved in the construction business.  (Tr. at 56:16-21.)  Shapiro denied discussing or knowing how La Bamba operated its business and about the creation and filing of CTRs. (Tr. at 57:20-58:6.)  He revealed that he had met with prosecutors several times to prepare for his testimony.  (*See* Tr. at 72:8-73:8.)  The question of charges or prosecution against Shapiro did not come up at any of these meetings.  (Tr. at 75:18-23.)  The Government's

3

objections to questions involving attorney-client privilege were sustained. (Tr. at 75:24-25; 76:22-24 ("Obviously, [the question of charges against you] must have come up with your lawyers. Right?" and "[Y]ou have never discussed with the prosecution -- either you or through your lawyers -- the avoidance of charges in this case?").) Another objection to the defense attorney's question about the recipient of Shapiro's gambling payments was also sustained. (Tr. at 77:16-18.) None of the other four defense attorneys cross-examined Shapiro.

On re-direct, Shapiro testified that he had met with the prosecutors as many times as he was asked, was not aware whether he was testifying under subpoena and explained why he thought Caro might have believed he was in the construction business. (*See generally*, Tr. at 78:9-81:23.) He confirmed that each check he wrote to a fictitious company was at Caro's direction. (Tr. at 81:4-7.)

### B.  Investigation of Shapiro In Connection With La Bamba

Investigators first learned of Shapiro's connection with Caro and La Bamba on or about January 18, 2008. (Rondon Aff. ¶ 3, D.E. 609-1.) It was then that IRS Special Agent William Rondon came across several high dollar amount checks written by Shapiro to one of the shell companies being investigated. (*Id.*) Rondon and IRS Special Agent Alfonso Herrera then met with Shapiro at his attorneys' offices on March 24, 2008. (*Id.* ¶ 4.) At that meeting, the agents learned that Shapiro was the Chief Executive Officer of Capital Investments, Inc., a financial lender and a real estate developer. (Herrera Memo. ¶ 1.) The remainder of the meeting was spent discussing Shapiro's dealings with Caro

and La Bamba. (*See generally*, Herrera Memo., D.E. 609-1.) Rondon met with Shapiro a second time shortly before his December 11, 2008 testimony. (Rondon Aff. ¶ 5.) Rondon ran Shapiro's name through the National Crime Investigation Center (NCIC) database and provided the results to the prosecutors before the trial. (*Id.* ¶ 6.)

### C.  Shapiro Pleads Guilty to Fraud

Shapiro's company, Capital Investments, Inc., began a bankruptcy proceeding in the District of New Jersey on or around October 9, 2009. In reality, Capital Investments was a *Ponzi* scheme run by Shapiro and, unbeknownst to him, he was the subject of an investigation by the FBI beginning in or around September 2008. (Rondon Aff. ¶¶ 8.1; 9.1.) No target letter was sent to Shapiro and he remained seemingly unaware of the investigation until approximately April 14, 2010. (*Id.* ¶¶ 8.2; 8.3; 9.2.) The federal complaint against Shapiro was filed in the District of New Jersey on April 21, 2010. (*Id.* ¶ 7.)

Shapiro pled guilty on September 15, 2010 to charges of fraud in connection with the Capital Investments *Ponzi* scheme. (Shapiro Plea Colloquy, D.E. 609-1.) He admitted that he "fraudulently obtain[ed] money from investors by falsely claiming that the money was going to be used in Capital's grocery diversion business when in fact it was used for [his] personal benefit and to pay early investors from funds received from later investors[.]" (*Id.* at 11:19-23.) Approximately five to eight million dollars of the thirty-five million dollars in misappropriated funds went to the payment of Shapiro's illegal gambling debts. (*Id.* at 13:22-24.) He also admitted to improperly using funds to

5

"give gifts to dozens of student athletes who are attending the local university to which [he] made significant donations," including "cash payments of up to $10,000 and gifts such as jewelry and entertainment expenses at various night clubs and restaurants in Miami Beach, Florida[.]" (*Id*. at 14:24-15:8.) Shapiro is presently incarcerated.

Assistant United States Attorney Wilfredo Fernandez, who prosecuted Caro and La Bamba, first informed Defendants' counsel via e-mail on April 21, 2010 of Shapiro's New Jersey prosecution. (Fernandez e-mail, D.E. 609-1.) In that e-mail, he claimed to have first learned of the FBI's investigation on April 12, 2010. (*Id*.) His e-mail concludes by indicating that no one in his office or in the IRS was aware of the fraud allegations against Shapiro. (*Id*.) Subsequent e-mails from AUSA Fernandez to Defendants' counsel and affidavits from Rondon and former AUSA Eric Bustillo[2] are all consistent with the Government's assertion that nobody involved with the La Bamba prosecution was aware of Shapiro's investigation until April 2010.

**D.    Hurricane Nevin: The Aftermath**

Shapiro's guilty plea to fraud charges stemming from the Capital Investments *Ponzi* scheme has had wide-ranging repercussions. The bankruptcy trustee in New Jersey

---

[2]    Bustillo is currently Regional Director of the SEC's Miami Regional Office and former Chief of the Economic and Environmental Crimes Section at the United States Attorney's Office for the Southern District of Florida. He joined the SEC on February 1, 2010 and his new office learned of Shapiro's investigation when it was contacted by the D.N.J. just prior to his start date. (Bustillo Aff. ¶¶ 4, 7.) While at the Southern District of Florida, Bustillo was walled off from *United States v. Juan Rene Caro, et al.*, because one of the charged defendants, Jose Chaoui, was a relative of the wife of a former colleague and friend. (*Id*. ¶ 3.) For this reason he is not considered part of the prosecution team as set forth, infra, and his knowledge of the Shapiro investigation is irrelevant.

is attempting to claw back funds allegedly paid by Capital Investments to Shapiro's former counsel for their representation in the La Bamba investigation and trial. In August of this year, Yahoo! Sports published a story revealing the extent of Shapiro's gifts to past and present athletes at the University of Miami, putting the immediate future of the "U"'s athletic programs in serious doubt. Most pertinent, however, is the instant motion for new trial filed by Caro and La Bamba, alleging that Shapiro's perjured testimony and the Government's apparent complicity tainted the outcome of their trial.

## II.     Defendants' Motions for New Trial, an Evidentiary Hearing and Discovery

### A.     Defendants' Motions

Defendants now move for new trial pursuant to Federal Rule of Civil Procedure 33, citing the newly discovered evidence that Shapiro was being already being investigated when he testified and therefore gave perjured testimony. Claiming that Shapiro's investigation focused on criminal activities spanning 2005 through 2009, Defendants accuse the prosecutors in this case of *Brady* and *Giglio* violations, alleging failure in disclosing Shapiro's investigation during the 2008-09 trial.

In support of their motion, Defendants claim that Shapiro's testimony at trial provided the only "direct substantiation of the government's theory" against Caro and La Bamba and was given by *"the sole, unimpeached witness"* in the case. (Mot. for New Trial at 4 (emphasis in original).) The remainder of the Government's witnesses, Defendants argue, were construction contractors who believed Caro's shell companies were legitimate or former Caro associates and other unsavory characters who had

7

significant motives to incur benefits from the Government. Shapiro's testimony was therefore vital to the Government's case and subsequently strengthened when the Defendants' counsel's attempts to cross-examine Shapiro on his use of funds loaned by Caro were halted by the Government's sustained objections. (*Id*. at 5.)

Defendants cite to Shapiro's plea colloquy in his New Jersey prosecution to support their claims that he perjured himself as to the nature of his business, the nature and amount of his gambling debts and the use of his investors' funds. (*See id.* at 8-9.) Had Shapiro's investigation and culpability for fraud been disclosed prior to his testimony, Defendants contend that his credibility and the Government's case would have been eviscerated. (*Id*. at 10.)

Following this Court's June 28, 2011 Order Denying Without Prejudice their Motion to Compel Discovery (D.E. 617), Defendants renewed their motions for an evidentiary hearing and to take discovery from the SEC, FBI, IRS, the United States Attorney's Offices for the District of New Jersey and Southern District of Florida, the Department of Justice, the Capital Investments bankruptcy trustee, the author of the Yahoo! Sports report and Shapiro himself, in order to expand the record on their claims. (*See generally*, Am. Mot. To Compel Discovery.) Defendants argue that an evidentiary hearing is necessary in this case and recent events make discovery necessary to determine just who might have known of Shapiro's investigation at the time of trial.

**B.     The Government's Responses**

The Government opposes both Defendants' Motion for New Trial and Amended

Motion to Compel Discovery and Evidentiary Hearing. It argues that Defendants inflate the importance of Shapiro's testimony to the overall case, as well as mis-characterize the nature of his alleged perjury. (Resp. To Mot. For New Trial at 3.) The evidence against Defendants, including the testimony of several witnesses and video recordings, was more than sufficient to support a guilty verdict. (*Id*. at 10.) The Government notes that the only objections sustained during cross-examination of Shapiro were on the basis of attorney-client privilege, relevance and confidentiality (*e.g.*, the address of Capital Investments and to whom Shapiro paid gambling debts). (*Id*. at 5-6.) It also stresses that none of the other four defense counsel cross-examined Shapiro, calling into doubt the Defendants' claim that their attempts to question Shapiro were stymied. (*Id*. at 6.)

The Government attempts to re-frame Defendants' claim as an alleged *Giglio* violation, as the information purportedly withheld would not be exculpatory to Defendants, but merely impeachment evidence. (*Id*. at 9 (citation omitted).) For Defendants to succeed on their claim, they must establish that (1) the prosecutor used perjured testimony or failed to correct what he later learned was perjured testimony, (2) the prosecutor acted knowingly and (3) the perjured testimony was material. (*Id*. (citations omitted).) The Government argues that Defendants cannot meet any of these prongs.

In addition, the Government argues that Defendants' broad sweep of various Government agencies and law enforcement units to infer knowledge of Shapiro's investigation is unavailing – only *Brady* and *Giglio* materials possessed by the

9

"prosecution team" are required to be disclosed.  (*Id*. at 11.)  In this case, the prosecution team consisted of AUSA Fernandez, DOJ attorney Steven Grimberg, two local police detectives and the IRS Agents, Rondon and Herrera.  (*See id.* at 12-13; *see also* Order Denying Without Prejudice Mot. For Discovery at 4.)  Pursuant to the statements and affidavits of AUSA Fernandez, Bustillo and Rondon, it is evident that no one on the prosecution team learned of the investigation and charges against Shapiro until 2010, long after the trial in this case ended.

The Government opposes Defendants' Motion to Compel Discovery and for Evidentiary Hearing for similar reasons.  It argues that any discovery that may be warranted would only be compelled from the prosecution team; and the prosecution team has already admitted to having no knowledge of Shapiro's investigation prior to 2010.  Regarding an evidentiary hearing, the Government contends that one is unnecessary as the acumen gained by this Court over the course of proceedings makes it well qualified to rule on the motion without a hearing and this case does not present a unique situation – jury tampering, prosecutorial misconduct or third party confession – in which a hearing might typically be ordered.

### III.   Legal Standard

A court evaluating a motion for new trial involving *Brady* or *Giglio* violations does not use the Rule 33 standard based on newly discovered evidence.  *See United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002); *United States v. Cook*, 170 Fed. Appx. 639, 640 (11th Cir. 2006); *see also Ventura v. Att'y Gen. Fla.*, 419 F.3d 1269, 1276 (11th

Cir. 2005).  Instead, to establish that a new trial is warranted due to *Brady* violation, the defendant must show that (1) the government possessed favorable evidence to the defendant, (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence, (3) the prosecution suppressed the favorable evidence and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different. *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989).  Similarly, to obtain a new trial based on an alleged *Giglio* violation, "the defendant must demonstrate that the prosecutor 'knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material.'" *Vallejo*, 297 F.3d at 1163-64, *citing United States v. Dickerson*, 248 F.3d 1036, 1041 (11th Cir. 2001).[3]  This same standard applies to the allegation of prosecutorial misconduct based on the use of false testimony.  *United States v. Cha*, 2011 U.S. App. LEXIS 12532, at ** 15-16 (11th Cir. June 20, 2011).

Perjured testimony is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Dickerson*, 248 F.3d at 1041-42 (citation omitted)  Failure to establish prejudice, in that the evidence probably would not have produced a different result, is fatal to a motion for new trial. *Ferguson v. Sec'y Dept. of Corrs.*, 580 F.3d 1183, 1207 n.33 (11th Cir. 2009).

The decision whether to hold an evidentiary hearing is left to the trial court's

---

[3] Perjury is a statement under oath that is false, known to be so, and material to the proceeding.  18 U.S.C. § 1623.

11

sound discretion. *United States v. Slocum*, 708 F.2d 587, 600 (11th Cir. 1983); *see also United States v. Massey*, 89 F.3d 1433, 1443 (11th Cir. 1996). An evidentiary hearing on a motion for new trial is unnecessary if "the acumen gained by a trial judge over the course of the proceedings [makes them] well qualified to rule on the [evidence] without a hearing." *United States v. Schlei*, 122 F.3d 944, 994 (11th Cir. 1997) (citation omitted). A court may ordinarily decide such a motion without an evidentiary hearing; it is only where certain unique situations arise, such as jury tampering, prosecutorial misconduct or third party confession, that the court will order a hearing. *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977).

## IV. Discussion

### A. Defendants' Motion for New Trial

Shapiro's fraud conviction in the District of New Jersey and allegedly perjured testimony at trial, if known, would not have been exculpatory as to Caro or La Bamba. Instead, it would have been impeachment material. Therefore the Court will consider Defendants' Motion under the three-pronged analysis set forth in *Dickerson*. 248 F.3d at 1041.

#### 1. The Use of Perjured Testimony At Trial

As an initial matter, the Court finds the only affirmative statements made by Shapiro at trial that may constitute perjury are his occupation ("I'm a wholesale grocery broker, and I raise capital for real estate projects") and the business purpose of Capital

Investments ("It's a wholesale grocery brokerage").  (Tr. at 4:16-18; 48:20-25.)  Shapiro directly contradicts these statements in his plea colloquy, revealing the fraudulent nature of his dealings through Capital Investments.  (Plea at 37:17-24.)  The Court does not find that Shapiro perjured himself as to the amount of his gambling losses or whether he was under investigation and hoping to curry favor through his testimony with prosecutors regarding potential criminal charges.  (*See* Tr. at 13-14 (discussing gambling losses); 75-76 (cross-examination regarding his prosecution).  As to the former, Shapiro did not state specific amounts of losses and, concerning the latter, the issue of his criminal activity involving Capital Investments never came up.

### 2. Defendants Cannot Show That Prosecutors Acted Knowingly Or That This Evidence Existed At Time Of Trial

Defendants' most serious allegation in their motion for new trial is that the Government knowingly violated *Giglio* when it put Shapiro on the stand, without first disclosing his investigation and impending criminal charges; and then when it did not correct his perjured statements regarding Capital Investments.  The record does not support the allegation that prosecutors acted knowingly.

A motion for new trial based on alleged *Brady* or *Giglio* violation must be denied if, for example, the prosecutor could not have produced evidence because it had not existed at time of trial.  *United States v. Michtavi*, 390 Fed. Appx. 852 (11th Cir. 2010); *United States v. Mills*, 334 Fed. Appx. 946, 947-48 (11th Cir. 2008).  Although Shapiro's

13

fraudulent activity spanned 2005 through 2009, no investigation began until September 2008.  (Rondon Aff. ¶ 9.1) Other than conjecture and speculation based on facts such as Shapiro's retention of counsel in late December 2008, Defendants cannot show that anyone but the FBI and District of New Jersey had knowledge of the impending charges against Shapiro such that any *Giglio* information even existed in 2008.  *See Mills*, 334 Fed. Appx. At 947-48.

Upon the statements of AUSA Fernandez and the affidavits of Rondon and Bustillo, the Court finds that Defendants cannot show that any member of the prosecution team was aware of Shapiro's investigation or of Capital Investments' fraudulent activity until April 2010, approximately fourteen months after trial concluded in this case.  Defendants' contention that knowledge of Shapiro's investigation and the subsequent duty to disclose should be imputed upon the entire U.S. Attorney's Office for the Southern District of Florida, the SEC, DOJ, IRS and the U.S. Attorney's Office for the District of New Jersey is in direct contravention of the law of this circuit.  *See Meros*, 866 F.2d at 1309 ("[a] prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a *Brady* request for information regarding a government witness").  *Brady* (and therefore *Giglio*) applies to evidence and information possessed by the prosecutor or anyone over whom the prosecutor has authority.  *United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011); *Meros*, 866 F.2d at 1309.

Finally, even if Shapiro learned of the investigation and impending charges around the time of trial and retained counsel in late December 2008, neither he nor his counsel had any duty to disclose this information to the Government.  Accordingly, Defendants fail to make the showing that prosecutors acted knowingly and therefore cannot satisfy this prong of *Dickerson*.

### 3. Shapiro's Perjured Testimony Was Not Material In Light Of The Overwhelming Evidence Against Defendants

Perjured testimony is material if its revelation "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Dickerson*, 248 F.3d 1036.  This is not the case here.

Shapiro testified to writing seven checks to Caro payable to five different companies, all at Caro's instruction.  Two were payable to La Bamba, three were payable to entities not referenced in the Superseding Indictment (AFP Painting and AFC Painting) and two were payable to companies mentioned in the Superseding Indictment as being fictitious shell companies (D&C Construction and Huber Construction). D&C and Huber Construction were only cited in the conspiracy charge against Defendants and not in any of the affirmative charges of filing false CTRs.  (*See* Superseding Indictment at 6-7, 19.) The substance of Shapiro's testimony went only to show that Caro knowingly provided names of fictitious shell companies.  His was not the only testimony at trial on this issue. Numerous witnesses, such as Donadillo, Agustino, Varela and Joseph Dieppa, testified

15

that Caro personally provided the names of fictitious companies. In addition, video clips were shown to the jury in which Caro structured deposits to avoid bank detection, acknowledged the fictitious check cashing companies and made comments that suggested he sought to evade law enforcement.

The Court finds, as it did in its June 5, 2009 Order Denying Motion for New Trial and Judgement of Acquittal (D.E. 450), that the evidence presented at trial was more than sufficient to allow the jury to find that Caro participated in a conspiracy to file false CTRs in order to evade CTR reporting requirements. (*See* June 5, 2009 Order at 5 (the Court made its findings on the sufficiency of evidence without attributing Shapiro's testimony).) With Shapiro's testimony relevant to such a slim portion of the charges against Defendants, no showing can be made that "a new trial would probably produce a different result" with regard to the conspiracy or the affirmative counts of filing of false CTRs. *See United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003).

Consequently, Defendants have not met the third prong of *Dickerson*, failing to establish how Shapiro's perjured testimony has undermined confidence in the verdict. 248 F.3d at 1041-42.

### 4. Impeachment Evidence Alone Is Not Sufficient For New Trial

Defendants' claims that Shapiro was the only unimpeached witness at trial are undermined by the record. Shapiro admitted on both direct and cross-examination that he engaged in illegal gambling (Tr. at 13:25-14:4.) Shapiro was also questioned by the

16

Government about potential exposure to charges of "gambling or tax or bank fraud." (Tr. at 10:10-13.) Given his admission of illegal activity and the potential of charges to come, Shapiro cannot aptly be characterized as the only virginal witness at trial.

Nevertheless, the Court assumes that Shapiro's subsequent fraud conviction would have had additional impeachment value if known at time of trial.[4] Impeachment evidence alone is not enough to merit a new trial. *Jernigan*, 341 F.3d at 1287; *United States v. Thompson*, 335 Fed. Appx. 876, 881 (11th Cir. 2009) (Eleventh Circuit affirmed denial of new trial and evidentiary hearing where the misconduct by police officers occurred after appellant's trial). Moreover, Defendants would not be entitled to a new trial so that they may impeach a witness based on that person's actions that occurred *after* [their] original trial." *Thompson*, 335 Fed. Appx. at 881. Like the appellant in *Thompson*, Defendants do not argue that Shapiro fabricated or lied about his dealings with Caro; instead they maintain that they could impeach him in a new trial in light of his later guilty plea. *Id.* This is not a valid reason for a new trial.

### B. Defendants Motion to Compel Discovery And For Evidentiary Hearing

As discussed in **Section IV.A.1**, *supra*, Defendants have not presented anything to

---

[4] Another problem with Defendants' argument is that Shapiro had not been convicted of fraud at the time of his testimony. Shapiro pled guilty in September 2010. At the time of Shapiro's testimony in December 2008, Defendants would not have been able to prove his investigation for fraud by extrinsic evidence. *See* Fed. R. Evid. 608(b). Defendants would only have been able to cross-examine Shapiro on the conduct underlying his investigation. It is likely that faced with such questions on cross-exam, Shapiro would have invoked his *Fifth Amendment* right. For that reason, it is even more likely that had the Government known of his investigation they would not have put Shapiro on the stand.

17

establish that the prosecution team knew or should have known that Shapiro was committing perjury and under investigation for fraud. *See Boyd v. Allen*, 592 F.3d 1274, 1308 (11th Cir. 2010) (affirming denial of motion for evidentiary hearing). Their claims to this effect are conclusory and aspirational. Defendants expect that discovery followed by an evidentiary hearing will allow them to fully develop their claims but this logic ignores established case law. *See id*. Without specifics, conclusory and inflammatory allegations are insufficient to entitle Defendants to a hearing. *Id.*

Defendants rely heavily on *United States v. Espinosa-Hernandez* in support of their argument for new trial, discovery and an evidentiary hearing. 918 F.2d 911 (11th Cir. 1990). *Espinosa* involved serious allegations of wrongdoing subsequent to defendant's conviction by Urso, a customs service agent and witness for the government. *Id.* at 912-913. Urso was indicted for making false statements on his federal job application and was under investigation for his alleged participation in the distribution of cocaine and the escape of a confidential informant from custody. *Id.* at 913. The Eleventh Circuit noted that Urso "had a tremendous impact on Espinosa's conviction" and found that it was "impossible to say that evidence of Urso's misconduct [was] merely impeaching" without discovery and an evidentiary hearing. *Id.* at 913-14. The Court also concluded that discovery might enlighten the District Court as to when the United States Attorney's office first learned of the allegations against Urso. *Id.* at 914. Depending on the answer, the defendant might be entitled to a new trial based on the

government's failure to disclose this impeachment evidence. *Id.* at 914. Consequently, the Eleventh Circuit reversed denial of the defendant's motion for new trial, holding that such a ruling was both premature and an abuse of discretion. *Id.*

The circumstances surrounding Shapiro's testimony and subsequent criminal investigation are easily distinguishable from *Espinosa*. Shapiro's impact on Caro and La Bamba's conviction was minimal. Evidence of the investigation of Shapiro and his subsequent guilty plea to fraud would have been merely impeaching. *See Thompson*, 335 Fed. Appx. at 881. Statements and affidavits from the prosecution team suffice to answer the question of when the Government learned of Shapiro's investigation. Finally, nothing presented by Defendants has linked Shapiro's fraud with Capital Investments to the seven transactions about which he testified at trial. *See Thompson*, 335 Fed. Appx. at 882 (appellant could not link the later misconduct of the police officers to their participation in his investigation).

Given the Government's representation that it had no knowledge of Shapiro's investigation until 2010 and this Court having presided over this case from indictment through post-trial motions, it is hard to see what could be achieved by holding an evidentiary hearing on the Motion for New Trial. *See Schlei,* 122 F.3d at 994; *Thompson*, 335 Fed. Appx. at 882. Accordingly, Defendants' Motion to Compel Discovery and For Evidentiary Hearing is denied.

**V.    Conclusion**

Consistent with the foregoing, it is **ORDERED AND ADJUDGED** that:

1. Defendants Juan Rene Caro and Maytemar Corporation d/b/a La Bamba Check Cashing's Corrected Motion for New Trial (D.E. 602), filed on January 4, 2011, is **DENIED**.

2. Defendants Juan Rene Caro and Maytemar Corporation d/b/a La Bamba Check Cashing's Amended Motion to Compel Discovery and Evidentiary Hearing In Support of Their Motion For New Trial (D.E. 618), filed on July 12, 2011, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 3rd day of October, 2010.

                                                                                             **JOAN A. LENARD**
                                                                                            **UNITED STATES DISTRICT JUDGE**